PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4545

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHARLES LEONARD GALLOWAY, a/k/a Len,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Richard D. Bennett, District Judge.
(1:10-cr-00775-RDB-1)

Argued: December 11, 2013          Decided: April 15, 2014

Before TRAXLER, Chief Judge, and NIEMEYER and DUNCAN, Circuit
Judges.

Affirmed by published opinion.   Judge Niemeyer wrote the
opinion, in which Chief Judge Traxler and Judge Duncan joined.

**ARGUED:** Megan Elizabeth Coleman, MARCUSBONSIB, LLC, Greenbelt,
Maryland, for Appellant. Sujit Raman, OFFICE OF THE UNITED
STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:**
Rod J. Rosenstein, United States Attorney, Ayn B. Ducao,
Assistant United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.

NIEMEYER, Circuit Judge:

Charles Galloway was convicted in Baltimore, Maryland, of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The district court sentenced Galloway to 292 months' imprisonment, and Galloway filed this appeal, raising several issues with respect to his conviction. We affirm.

I

In connection with an investigation based in San Diego, California, of an international drug trafficking conspiracy, Special Agent James Karas of the DEA uncovered the involvement of Charles Galloway in Baltimore, Maryland. Based on information provided by Special Agent Karas, Detective Keith Sokolowski of the Baltimore City Police Department began investigating Galloway and eventually obtained authorization to place wiretaps on four of his cell phones. Through these wiretaps, Detective Sokolowski learned that Galloway used one phone predominantly for drug-related conversations, while he reserved a second phone for his conversations with Santos Chavez, a coconspirator in the Los Angeles, California area. Based on the intercepted conversations and on the testimony of actual drug traffickers in the Baltimore area, Galloway was convicted of conspiracy to traffic in heroin.

2

At trial, Special Agent Karas and Detective Sokolowski testified not only as fact witnesses, but also as expert witnesses in drug distribution methods and the interpretation of the coded language used in narcotics-related telephone calls. The officers explained how drug traffickers use unrelated words to refer to drugs, prices, and related issues, explaining that while there is no established vocabulary, the meaning of the ad hoc words used in lieu of other possibly incriminating words may be derived from context. The officers testified that, in their opinions, Galloway and his coconspirators used such coded language in their intercepted conversations.

Following Galloway's conviction, the district court sentenced him to 292 months' imprisonment.

This appeal followed.

## II

Galloway contends first that he was denied effective assistance of counsel by the privately retained lawyer who represented him for approximately five months -- from July 2011 until he was permitted to discharge her in January 2012, which was somewhat more than two months before trial commenced. He states that this lawyer failed to file any substantive pretrial motions on his behalf, failed to demand discovery in a timely fashion, and failed to communicate with him about his case. He

3

further asserts that her deficient performance resulted in his being "at a disadvantage at the motions hearing"; in his having "to scramble" with stand-by counsel for discovery only "weeks before trial"; and in his "electing to go forward with a trial, unprepared."

It is well established that "a defendant may raise [a] claim of ineffective assistance of counsel in the first instance on direct appeal if and only if it conclusively appears from the record that . . . counsel did not provide effective assistance. Otherwise, [he] must raise [his] claim in the district court by a collateral challenge pursuant to 28 U.S.C. § 2255 . . . ." United States v. Smith, 62 F.3d 641, 651 (4th Cir. 1995) (emphasis added) (internal quotation marks omitted). This standard is demanding, and Galloway has not met it here.

While the record surely supports Galloway's claim that he was dissatisfied with his first lawyer's services, he fails to demonstrate from the record that her performance fell below an objective standard of reasonableness, especially given that "[i]n evaluating counsel's performance, we must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)). At most, the record establishes that Galloway lodged serious allegations against his

4

lawyer, which his lawyer disputed.  As such, the record does not show conclusively that his allegations had any merit.

Moreover, Galloway has not shown that he was prejudiced by his first lawyer's performance.  To meet this element of an ineffective assistance claim, Galloway would have to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" and that "the result of the proceeding was fundamentally unfair or unreliable."  Sexton, 163 F.3d at 882 (internal quotation marks and citations omitted).  But the record shows that soon after Galloway brought his complaints about his first lawyer's services to the attention of the district court, the court appointed an Assistant Federal Public Defender to represent him and pushed back his trial date. Galloway's new counsel was then given a full opportunity to present pretrial motions on his behalf and to prepare for trial. In light of these precautionary measures, Galloway's claim that he was ultimately unprepared for trial surely stems more from subsequent decisions he made (1) to discharge the Assistant Federal Public Defender representing him; (2) to withdraw that lawyer's motion to continue the trial date; and (3) to represent himself at trial with stand-by counsel.

In short, Galloway's showing on this issue falls far short of conclusively establishing the ineffectiveness of his first counsel.

III

Galloway next contends that the district court abused its discretion by depriving him of meaningful access to discovery while he prepared his pro se defense. Specifically, he objects to the court's ruling that he could not take any discovery materials to the detention center where he was being held, including any handwritten notes he made regarding the discovery he reviewed. In addition, he contends that the alternative setup provided for him to review discovery in the U.S. Courthouse's lockup area was inadequate because the room did not have an electrical outlet, limiting his ability to review electronic evidence.

Based on the circumstances, we conclude that the district court acted within its discretion in so controlling discovery. As the court explained, "we've had enormous security issues with respect to federal detention facilities," including two different trials over which the district judge presided involving the murder of witnesses. Although the court recognized that it was inconvenient for both Galloway and the U.S. Marshals to transport Galloway to and from the U.S. Courthouse, the court reasonably concluded that the

6

inconvenience was justified by the circumstances. And while the lockup area did lack an electrical outlet, the Assistant Federal Public Defender mitigated the problem by providing Galloway with two extra laptop batteries. Finally, Galloway never sought a continuance based on the logistics of the arrangement. Rather, he repeatedly indicated that he did not want to postpone the trial any further. In view of the legitimate security concerns and Galloway's failure to show any prejudice from the arrangement, we find that the limitations the court imposed were reasonable. See United States v. Sarno, 73 F.3d 1470, 1492 (9th Cir. 1995) (concluding that while a pro se defendant's "access to discovery materials was hardly optimal," the "limitations imposed on him were reasonable"); see also United States v. Bisong, 645 F.3d 384, 396 (D.C. Cir. 2011) (noting that, "[e]ven assuming that pro se defendants have a Sixth Amendment right to discovery in preparing their defense," a defendant advancing such a claim "must demonstrate prejudice in order to prevail").

IV

Galloway also contends that the district court erred in denying his motion to suppress evidence obtained through the wiretaps, contending that the affidavits submitted in support of the wiretap applications failed to set forth specific facts showing why the wiretaps were necessary, as required by 18

7

U.S.C. § 2518. To obtain authorization for a wiretap, federal law requires the government to submit an application containing "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Galloway acknowledges that the affiants addressed why they believed that they would not be able to identify all the coconspirators or to achieve the investigation's other objectives by using traditional investigatory procedures alone, but he asserts that the explanations amounted to bare conclusory statements and boilerplate recitations that would more or less apply to any drug-trafficking investigation.

Although the government filed three separate wiretap applications with the Circuit Court for Baltimore City in order to obtain authorization to intercept calls over four cell phones used by Galloway, only the affidavits submitted in support of the first two wiretap applications -- one submitted on May 26, 2010, and one submitted on June 8, 2010 -- are at issue. Those affidavits detailed at length the steps that police officers had taken since January 2010 in investigating the Baltimore portion of an international drug conspiracy, and they contained fairly extensive discussions of why the affiants believed the wiretaps were necessary, addressing at least ten alternative

8

investigatory procedures. They explained that the police had already used several of those techniques -- for example, conducting physical surveillance, analyzing telephone toll records, and affixing GPS devices -- but that those methods had failed to reveal the full scope of the organization, showing instead "that members of this organization [were] extremely cautious in their movements and activities." The affidavits further explained why the officers believed that other investigatory techniques were unlikely to achieve the investigation's objectives, taking the position that certain methods (e.g., attempting to develop a confidential informant, subpoenaing witnesses to appear before a grand jury, and executing search warrants) were likely to reveal the existence of the ongoing investigation to Galloway and his associates, while other methods (e.g., trash searches and pole cameras) were not practical under the circumstances.

Based on this record, we cannot conclude that the authorizing court abused its discretion when it determined that the government had submitted sufficient facts to show the need for the wiretaps. See United States v. Wilson, 484 F.3d 267, 280 (4th Cir. 2007). The government's burden "is not great." United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994). While it cannot meet its burden with "bare conclusory statements that normal techniques would be unproductive or mere boilerplate

recitation of the difficulties of gathering usable evidence," "it need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating [the] criminal enterprise or in gathering evidence" such that "wiretapping becomes reasonable," despite "the statutory preference for less intrusive techniques." Id. at 1297-98 (alteration in original) (internal quotation marks and citations omitted). We believe that this standard was satisfied here.

Accordingly, we conclude that the district court did not err in denying Galloway's motion to suppress the wiretap evidence.

V

Finally, Galloway contends that the district court abused its discretion in admitting expert testimony from Special Agent Karas and Detective Sokolowski under Federal Rule of Evidence 702, as well as in managing the presentation of their testimony so as to avoid any confusion that might be caused by their testifying both as fact witnesses and as expert witnesses. More particularly, Galloway argues (1) that the court erred in receiving Special Agent Karas as an expert witness because he failed adequately to explain his methodology for identifying and translating coded language; (2) that the court failed to ensure that both witnesses reliably applied their methods and

10

principles to the facts in the case; and (3) that the court failed to enforce safeguards to prevent the jury from being confused regarding the officers' dual roles.

Galloway did not raise these challenges during trial and, in particular, did not object to the portions of testimony to which he now objects. Accordingly, he must satisfy the plain error standard of review, which requires that he show that the district court erred in receiving and managing the officers' testimony; that the errors were plain; and that the errors affected the outcome of the trial. See Fed. R. Crim. Proc. 52(b); United States v. Olano, 507 U.S. 725, 732-34 (1993); United States v. Baptiste, 596 F.3d 214, 220 (4th Cir. 2010). Moreover, even then, we will note errors only if a miscarriage of justice would result or the errors would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Baptiste, 596 F.3d at 220.

The district court qualified Special Agent Karas as an expert, based on his 15 years of experience during which he had participated in a number of DEA investigations that used wiretaps, personally reviewing "thousands" of narcotics-related telephone calls. In addition, Special Agent Karas had previously been qualified as an expert witness in other trials with respect to the interpretation of coded language used in narcotics-related communications. The court qualified Detective

11

Sokolowski as an expert on similar grounds, relying on his extensive experience investigating narcotics organizations, which included listening to "thousands" of intercepted drug-related conversations and testifying about the coded language used in them. Detective Sokolowski explained how, through his experience, he had become familiar with the fact that drug dealers use coded language when speaking about narcotics and that, while there were some common code words, most were subject to interpretation based on the context of the conversation. As he explained, "Basically, in the context of the call you can just listen to the way the people go back and forth, and given an investigation where you should have a very good understanding of what's going on already, you'll understand what they're talking about." Upon qualifying the first of these two officers as an expert witness, the court instructed the prosecutor in the jury's presence to "be careful that we separate his lay testimony as a lay witness from the proffer of any expert testimony."

Galloway complains about Special Agent Karas's interpretation of the following statement, which Chavez made during a conversation with Galloway:

> Here's um, here's what we're gonna do, um, I, I don't want to just fly out there, like I had told you, for just, you know, couple of bucks, so, what I have to do, is, have 20 dollars here with me for these guys when they gonna give me the 6 credit cards. . . .

12

Okay, they gonna give me the 3 of my boys and 3 of the other 3.

Karas explained that, in his opinion, "20 dollars" was code for $20,000, noting that he had previously come across narcotics traffickers using this type of shorthand to disguise the actual dollar amounts they were discussing. He also gave his opinion that Chavez was using the phrase "6 credit cards," as well as the phrase "3 of my boys and 3 of the other 3," as coded language to refer to drugs.

In a similar vein, Galloway objects to Detective Sokolowski's explanations of conversations based on the context given. Sokolowski testified, for example, that "demonstration" was a code word used three times in various calls to refer to drugs and once to refer to a gun. His interpretation was later corroborated by an individual who testified that he had routinely bought heroin from Galloway and that he and Galloway had used words like "demonstrations" in their conversations as code for drugs, guns, or whatever else they wanted "to coverup." Sokolowski also gave an opinion that when one of the couriers told Galloway, "The people with the contract, they probably have their own heads," the courier was referring to the fact that the network's heroin suppliers were using their own couriers. Sokolowski testified further that, in his opinion, "baby" and "CDs" were code words used to refer to drugs; that "food caps"

13

and "food jars" were coded phrases used to refer to drug packaging materials; and that the phrase "getting ready to get the birds out" was coded language meaning that the speaker intended "to wake early and get out on the street to sell product."

After reviewing the entire record, we conclude that the district court did not plainly err in qualifying these officers as expert witnesses, nor in receiving their testimony about interpreting the coded portions of intercepted conversations. In receiving this evidence, the court functioned well within the scope of discretion given by Rule 702. As the advisory committee's note to that rule explains:

> [W]hen a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added); see also Baptiste, 596 F.3d at 223; Wilson, 484 F.3d at 274-75.

Both of these expert witnesses operated under the principle that drug-related conversations involve the use of code words to conceal the true nature of illegal activities. And both used

14

the method of applying their extensive experience to analyze the meaning of the conversations through context. Special Agent Karas explained that because narcotics traffickers do not all use the same code words for drugs, he has to look for meaning in the "context of a conversation or an investigation, not stand-alone in the word itself." Similarly, Detective Sokolowski explained that he had become familiar with the ways in which narcotics dealers use coded language "through everyday contact [with] people in the street, through everyday contact with informants, arrestees, police, just by speaking to people and learning every day the new and upcoming terminology." While he gave the jury examples of words that were commonly used by drug traffickers, he also explained how he relied on "the context of the call" to translate the coded words being used in a particular telephone call. Based on this record, we conclude that the district court did not plainly err in conducting its gatekeeping function under Rule 702 with respect to these officers' expert testimony.

With respect to Galloway's challenge to the use of Special Agent Karas and Detective Sokolowski as both fact witnesses and expert witnesses, the district court adequately followed established protocols. See Baptiste, 596 F.3d at 223-26; Wilson, 484 F.3d at 278 n.5. After accepting both officers as expert witnesses, the court emphasized to the jury that while

15

these witnesses would be permitted to give "opinions as to coded language and methods of distribution," it was still for the jury to "accept, reject, or whatever in terms of whether or not you accept that testimony or not." The court further admonished the prosecutor in the jury's presence to "be careful that we separate . . . lay testimony as a lay witness from the proffer of any expert testimony." And based on our review, the government heeded this instruction.

At bottom, we conclude that the district court committed no plain error that affected Galloway's substantial rights.

The judgment of the district court is

AFFIRMED.