**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4522**

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

        v.

ALTON BENN,

                    Defendant – Appellant.

**No. 12-4803**

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

        v.

SEAN DARNELL JEFFRIES,

                    Defendant – Appellant.

**No. 12-4804**

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

        v.

ROBERT EUGENE POOLE,

                    Defendant – Appellant.

_____

**No. 12-4851**
_____

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

          v.

KEVIN GORDON HAITH,

                    Defendant – Appellant.

_____

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, District Judge.    (1:11-cr-00127-TDS-2;    1:11-cr-00127-TDS-1; 1:11-cr-00127-TDS-4; 1:11-cr-00127-TDS-3)

_____

Argued:  April 11, 2014                    Decided:  May 21, 2014

_____

Before KING, GREGORY, and THACKER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Sandra Barrett, Asheville, North Carolina; Robert Lynn McClellan, IVEY, MCCLELLAN, GATTON & TALCOTT, LLP, Greensboro, North Carolina; John Clark Fischer, RANDOLPH & FISCHER, Winston-Salem, North Carolina; Thomas Hilton Johnson, Jr., GRAY JOHNSON BLACKMON LEE & LAWSON, LLP,  Greensboro, North Carolina, for Appellants.  Lisa Blue Boggs, Stephen Thomas Inman, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF**: Ripley Rand, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

_____

2

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this multi-defendant appeal, we are faced with several assignments of error. Four co-defendants -- Alton Benn, Sean Darnell Jeffries, Robert Eugene Poole, and Kevin Gordon Haith (collectively, "Appellants") -- were tried by a jury and convicted of conspiracy to distribute crack cocaine and unlawfully possess cocaine hydrochloride with the intent to make crack cocaine. Appellants Poole and Haith were also convicted of related firearm charges. Following trial, Appellants were sentenced to terms of imprisonment varying from 114 to 440 months.

Appellants claim their conspiracy convictions were based on insufficient evidence; the testimony of an unindicted co-defendant, who testified pursuant to an immunity agreement, was unreliable; and the Government's expert witness was neither timely noticed, nor qualified. Appellants Benn, Jeffries, and Haith challenge their sentences on various grounds, including that they were in contravention of the recent Supreme Court decision Alleyne v. United States, 133 S. Ct. 2151 (2013). Appellant Haith also challenges his career offender and armed career criminal designations as violative of our decision in United States v. Davis, 720 F.3d 215 (4th Cir. 2013). For the reasons that follow, we affirm.

4

I.

A.

The facts underlying this appeal are presented in the light most favorable to the prevailing party at trial -- the Government. See United States v. Lespier, 725 F.3d 437, 440 n.2 (4th Cir. 2013). The Greensboro Police Department ("GPD") began an investigation into a purported crack cocaine conspiracy in Greensboro, North Carolina, in 2007. The conspiracy was believed to be run by a distribution organization known as the "Bundy Boys." GPD Narcotics Officer R.L. Alston began investigating the alleged leader of the Bundy Boys, Appellant Benn (a.k.a. "Bundy" or "B"). Alston learned that, along with Appellant Benn, Leonard Gary Williams (a.k.a. "G"), and Appellants Poole (a.k.a. "Pooh"), Jeffries (a.k.a. "Fuzz"), and Haith (a.k.a. "Smoke") were involved in the Bundy Boys' distribution of crack cocaine between 2006 and 2010.

As part of his investigation, Officer Alston conducted surveillance at Appellant Benn's residence, and saw other members of the Bundy Boys coming and going on a regular basis. On May 24, 2007, Officer Alston conducted a trash pull at the residence and found a wrapper normally used to wrap kilograms of cocaine. After field-testing, it was revealed that the wrapper contained Appellant Benn's left palm print, and the residue on the wrapper tested positive for powder cocaine. On August 30,

2007, Officer Alston conducted another trash pull at the house, and found a white powder substance inside a trash bag. That substance also field-tested positive for cocaine. Officer Alston continued periodic surveillance of Appellant Benn's house from 2007-09. During this time, the GPD also conducted searches, and sometimes arrests, at around a dozen other residences in Greensboro, each of which had some link to the Bundy Boys.

1.

"The Bundy Boys"

At trial, both Tashee Mumford and Williams explained how they came to know the "Bundy Boys" and the inner-workings of their organization.

a.

Tashee Mumford's Testimony

Mumford testified that Appellant Haith introduced her to Williams and Appellant Benn, and through those individuals, she met Appellant Jeffries. She described Williams and Appellants Benn and Jeffries as the "Bundy Boys." She also testified that Appellant Poole was "with [Williams]" and would "hold the drugs sometimes," that is, "keep [them] safely, stor[e]" them "in case . . . you need to go get some more or run

6

out." J.A. 1420-21.[1] In addition, Appellant Poole would "keep [the drugs] at his house, or whatever location he was in, for the next time somebody needs some." Id. at 1421.

During her association with the Bundy Boys, Mumford sold crack cocaine at a house on Bragg Street in Greensboro with Appellant Haith, and those drugs were brought there by Appellant Benn or Williams. She said that after the drugs were sold, she or Appellant Haith would give the money to Appellant Benn. She and Appellant Haith also sold crack from a house on Charlotte Street. Later, Mumford moved away from Appellant Haith and started selling drugs at an apartment on Waugh Street. She explained that at that time, Williams and Appellants Benn and Jeffries were on "the same team." J.A. 1432.

Mumford described the structure of the Bundy Boys as follows:

> Bundy [Appellant Benn] would be first, or the head, person and then you have G [Williams] under him. Then you have, like, maybe Fuzz [Appellant Jeffries] under G, and then you will have all other workers or the people that was under them . . . who would run the houses, and then you would have us, the workers, that are in the house. So, basically, The Bundy Boys were the head of the whole operation.

J.A. 1457. Mumford explained that if Appellant Benn could not bring them drugs, Williams would, and when he could not,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

7

Appellant Jeffries would. She said sometimes Appellant Jeffries would "run a house." Id. at 1458. According to Mumford, after Williams was arrested, as explained below, Appellant Jeffries took over Williams's duties.

b.

Leonard Gary Williams's Testimony

Williams was arrested for selling crack cocaine with the Bundy Boys in April 2009. GPD officers raided his house on Oak Street and found crack cocaine and a .380 handgun. Williams did not remain in jail long, however, because Appellant Benn bonded him out. Williams continued to sell drugs to pay for his lawyer. He sold crack until he was again arrested in February 2010 by Officer Alston. After this arrest, he agreed to speak to federal agents in exchange for immunity.

Williams explained that he met Appellant Benn in Connecticut 20 years previously, and the two moved to North Carolina together around 1996. He said he met Appellant Haith in North Carolina in 1996, and Appellants Jeffries and Poole in North Carolina around 2004. From 2006 to his arrest in 2010, Williams's main source of income was selling crack cocaine. He and Appellant Benn would travel to purchase powder cocaine, and afterwards, Appellant Benn would cook it into crack cocaine.

Williams testified that the crack cooked by Appellant Benn would be sold at Pearson Street, Holt Street, McConnell

8

Road, Bragg Street, Charlotte Street, Winston Street, and Duke Street in Greensboro. He testified that Appellant Poole "might sell very little, but he would be the doorman sometime, and he will either ride with me or Mr. Benn and hold the drugs while they were delivered . . . [j]ust in case the police stopped, he would be the one who [would] take the charge or either run with it." J.A. 206.

As to the organizational structure of the Bundy Boys, Williams testified,

> [W]hen I first came, I had to work my way up. I ain't just start becoming the one who delivered the drugs. I had to work the window, watch out for the police. I had to sell the crack cocaine, and then I move up into the one that would help bag up the crack cocaine and deliver it. . . . It was like Mr. Benn was the president, I was the vice president, and everybody else was like the workers. . . . Sometime [the workers] would switch up from selling to watching the window or the door. That's about it.

J.A. 205. Williams explained that he stopped being the "vice president" sometime in 2008. At that time, "Mr. Benn and Mr. Jeffries became more closer than me and Mr. Benn." Id. at 247.

2.

Transporting Drugs/Money

According to Williams, Appellant Benn made powder cocaine purchases in Asheboro, Winston-Salem, and Atlanta. He and Appellant Benn made four trips to Asheboro; and he and Appellants Benn, Jeffries, and Poole made three to four trips to

9

Winston-Salem, each time to buy powder cocaine. Once they were back in Greensboro, they would cook the powder at either Appellant Benn's, Appellant Jeffries's, or Williams's residence, and it would be bagged for storage. Many times, Williams would deliver the drugs to Greensboro crack houses and collect the money and bring it to Appellant Benn. He explained that the crack houses ran day and night, seven days a week.

Williams testified that around 2007-08, he went to Atlanta three times to buy powder cocaine, and the first time, he went with Appellants Benn, Jeffries, and Poole; a worker named Helen Grier; and two other individuals. Their intention was to bring back three kilograms of powder cocaine. Williams, Appellants Benn, Jeffries, and others contributed money to make this purchase, but they only ended up with one "good" kilogram. J.A. 208. Thus, they returned to Atlanta, bought more powder cocaine, sold it in Greensboro, and obtained the proper amount to pay back those who had contributed money.

On one occasion in 2008, Williams did not make the trip to Georgia, but Appellant Benn told him about it. During that trip, law enforcement stopped the vehicle in which Appellants Benn, Jeffries, and Poole; Grier; and Barry Shamel were traveling. Williams explained,

> They went to purchase 8 kilos of cocaine; and after
> purchasing the 8 kilos of cocaine, . . . they was
> followed by some police in pick-up trucks. It turned

10

> into a high-speed chase and Mr. Benn got distant enough from the police. . . . Shamel jumped out with the black duffel bag with the 8 kilos of cocaine in it and went and buried them . . . [t]hen after that, the police closed in on Mr. Benn and Mr. Jeffries and Miss Grier, and they took Mr. Benn to jail for questioning. . . . Poole got out [of the vehicle] a little bit farther after [Shamel] got out[.]

J.A. 214-15. Grier testified that when Appellant Poole jumped out of the vehicle after Shamel, he carried a backpack full of materials used to cook crack. At Appellant Benn's direction, Williams wired $100 to him so that Shamel could get a hotel room after he buried the drugs. Once everyone returned to Greensboro, they took the eight kilograms of powder cocaine and buried it near Appellant Benn's residence. The next day, Appellant Benn cooked the powder cocaine into crack cocaine.

Later in 2008, Appellants Benn and Jeffries, along with a third man, made a trip to Texas to purchase two kilograms of powder cocaine. Appellant Benn called Williams and told him he had been stopped by the police, who took their money as soon as they crossed into Texas. Major Wade Robinson of the City of Orange Police Department in Texas performed a search of the vehicle and found $50,000 in cash in a black bag. DEA Special Agent Timothy Duriso testified that Appellant Jeffries claimed the money was his, but he was unable to explain the source of the cash. Williams had earlier testified that the money was going to be used to purchase two kilograms of powder cocaine.

11

In addition, GPD Detective Eric Goodykoontz testified that on May 20, 2009, police stopped a vehicle driven by Appellant Benn on English Road, near Phillips Avenue in Greensboro. Appellant Benn was with Appellant Poole. Appellant Poole was searched, and officers discovered scales and a glass smoking device in his shirt pocket. Upon further searching, officers discovered that Appellant Poole was hiding 1/2 ounce, or 14 grams, of crack cocaine in his buttocks.

B.

On August 30, 2011, Appellants were charged in a superseding indictment, as follows:

Count One - All Appellants conspired with Williams and others to distribute 280 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) ("Object One"), and to unlawfully possess 5 kilograms or more of a mixture containing a detectable amount of cocaine hydrochloride with the intent to make crack cocaine ("Object Two"), all in violation of 21 U.S.C. §§ 846, 841(b)(1)(A).

Count Two - Appellant Haith possessed a handgun and rifle in furtherance of a federal drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

Count Three - Appellant Haith was a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Count Four - Appellant Jeffries possessed with the intent to distribute 11.5 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

Count Five - Appellant Jeffries possessed a 9mm semi-automatic handgun, a Smith and Wesson 10mm semi-automatic handgun, and a 12 gauge "Street Sweeper" shotgun in furtherance of the drug trafficking crime

12

mentioned in Count Four, in violation of 18 U.S.C. § 924(c)(1)(a)(i) and (c)(1)(B)(ii).

Appellants proceeded to trial, with jury selection beginning on February 13, 2012. The Government's case-in-chief began on February 14, 2012, and continued over the course of nine days, to February 27, 2012. The Government rested, and each Appellant moved for judgment of acquittal per Rule 29 of the Federal Rules of Criminal Procedure. The district court granted Appellant Haith's motion to dismiss Object Two of Count One (the second prong of the conspiracy count -- possessing cocaine hydrochloride with the intent to manufacture crack cocaine), but denied the other aspects of Haith's motion and denied in their entirety the motions of Appellants Benn, Jeffries, and Poole. None of the Appellants presented any evidence in their defense. On March 5, 2012, the jury found Appellants guilty of the charges remaining against each of them, as follows:

Count One, Object One: The jury found that Appellants Benn, Jeffries, and Haith conspired to distribute 280 grams or more of crack cocaine, while finding that Appellant Poole conspired to distribute more than 28 but less than 280 grams.

Count One, Object Two: The jury found that Appellant Benn had conspired to possess five kilograms or more of cocaine hydrochloride with the intent to manufacture crack cocaine, while Jeffries possessed 500 grams but less than five kilograms of cocaine hydrochloride, and Poole possessed less than 500 grams of cocaine hydrochloride with the intent to manufacture crack.

13

Count Three:  The jury found Appellant Haith guilty of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Count Four:  The jury found Appellant Jeffries possessed with the intent to distribute 11.5 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

Count Five – The jury found that Appellant Jeffries possessed a 9mm semi-automatic handgun, a Smith and Wesson 10mm semi-automatic handgun, and a 12 gauge "Street Sweeper" shotgun in furtherance of the drug trafficking crime mentioned in Count Four, in violation of 18 U.S.C. §§ 924(c)(1)(a)(i) and (c)(1)(B)(ii).[2]

The district court held separate sentencing hearings for each defendant:

Appellant Benn – Benn's base offense level was 38, which is the level for offenses involving 8.4 kilograms or more of cocaine base.  See United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") §§ 2D1.1(a)(5), (c)(1) (2011).  After enhancements for possessing a firearm, maintaining a premises for the purpose of making and distributing drugs, committing the offense as a pattern of conduct used as his livelihood, and being an organizer or leader of the conspiracy, his offense level was 48, which was reduced to 43 pursuant to Chapter 5, part A of the Guidelines.  With a criminal history category of III, his Guidelines range was life in prison.  The statutory provision was 10 years to life.  The district court varied downward, and assigned a term of imprisonment of 440 months.

---

[2] The jury found that the "Street Sweeper" was a destructive device pursuant to 18 U.S.C. § 924(c)(1)(B)(ii), but also that Appellant Jeffries did not know the characteristics of the Street Sweeper that caused it to be a "destructive device." J.A. 2012.

Appellant Jeffries – Jeffries's base offense level was 38, for an offense involving 8.4 kilograms or more of cocaine base. See U.S.S.G. §§ 2D1.1(a)(5), (c)(1) (2011). He received two enhancements, which he does not dispute, plus one 3-level increase for being a manager or supervisor (but not an organizer or leader) of the conspiracy, which he disputes in this appeal. See U.S.S.G. § 3B1.1(b) (2011). These adjustments took his offense level to 45, which was reduced to 43 pursuant to Chapter 5, part A of the Sentencing Guidelines. With a criminal history category of II, his Guideline range was life in prison as to Count One, and 60 months as to Count Five, to be served consecutively. The district court varied downward and imposed a sentence of 300 months on Count One; 240 months on Count Four, to be served concurrently; and 60 months on Count Five, to be served consecutively, for a total of 360 months in prison.

Appellant Haith – Haith's base offense level was 38, for an offense involving 8.4 kilograms or more of cocaine base. See U.S.S.G. §§ 2D1.1(a)(5), (c)(1) (2011). He received a 2-level increase for maintaining a premises for the purpose of manufacturing and distributing drugs, and a 3-level increase for being a manager or supervisor (but not an organizer or leader) of the conspiracy. This brought his offense level to 43. Haith was designated as a career offender and armed career criminal. His Guideline range as to Counts One and Three was life in prison, and for Count Two, it was 60 months, to run consecutively. The district court sentenced him to downwardly variant 309-month concurrent sentences on Counts One and Three, and a 60-month consecutive sentence on Count Two, for a total of 369 months in prison.

Appellant Poole – The district court sentenced Appellant Poole to 114 months in prison. Poole is not challenging his sentence in this appeal.

Appellants filed timely notices of appeal, and the appeals were consolidated. We held oral argument on Friday, April 11, 2014, in Charleston, South Carolina.

15

II.

All Appellants challenge their conspiracy convictions as unsupported by sufficient evidence; and Appellants Benn and Jeffries contend that the testimony of Williams was "inherently unreliable." Appellants' Br. 2.[3]

A jury verdict must be sustained "if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by substantial evidence." United States v. Smith, 451 F.3d 209, 216 (4th Cir. 2006) (internal quotation marks omitted). "Substantial evidence" is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted). Reversal for insufficient evidence "is reserved for the rare case 'where the prosecution's failure is clear.'" United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (citing Burks v. United States, 437 U.S. 1, 17 (1978)).

To support a conspiracy conviction, the jury must have believed beyond a reasonable doubt that (1) there was an agreement between the defendant and one or more persons to possess with the intent to distribute cocaine base (Count One, Object One), or to possess hydrochloride with the intent to

---

[3] Appellants filed a joint opening brief in this case.

16

manufacture cocaine base (Count One, Object Two); (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became part of the conspiracy. See United States v. Williams, 632 F.3d 129, 135 (4th Cir. 2011). After a conspiracy is shown to exist, "the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Kellam, 568 F.3d 125, 139 (4th Cir. 2009) (internal quotation marks omitted). Indeed, "[e]vidence of a buy-sell transaction coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators," as can "evidence of continuing relationships and repeated transactions . . ., especially when coupled with substantial quantities of drugs." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008) (internal quotation marks omitted) (alteration omitted).

Having independently reviewed the record, we reject each of the Appellants' arguments on this point. We find sufficient evidence from numerous witnesses that each Appellant made an agreement with at least one of the others to commit the charged crimes, that each Appellant knew of the conspiracy, and that each Appellant knowingly and voluntarily became part of the conspiracy.

In addition, to the extent Appellants Benn and Jeffries suggest that Williams's testimony obtained pursuant to

17

an immunity agreement is per se questionable, they are asking this court to make a credibility determination on appeal, but credibility determinations "are within the sole province of the jury and are not susceptible to judicial review." United States v. Palacios, 677 F.3d 234, 248 (4th Cir. 2012) (internal quotation marks omitted); see also United States v. Smith, 30 F.3d 568, 571-72 (4th Cir. 1994) (rejecting a similar claim that the government's evidence was "somehow tainted" because it came from persons who were granted immunity and signed plea agreements in exchange for substantial assistance).

For these reasons, we conclude that Appellants' conspiracy convictions were supported by substantial evidence.

III.

Appellants Benn, Jeffries, and Haith challenge their sentences for various reasons. We discuss each of Appellants' arguments in turn.

A.

Appellant Benn

As set forth above, Appellant Benn's base offense level was 38, which is the level for offenses involving 8.4 kilograms or more of cocaine base. See U.S.S.G. §§ 2D1.1(a)(5), (c)(1) (2011). Appellant Benn contends that, although the jury found him guilty of conspiring to distribute more than 280 grams of crack and possessing more than 5 kilograms of cocaine powder,

18

and the district court sentenced Appellant Benn based on more than 8.4 (specifically, 21.46) kilograms of crack, "in all its searches and seizures, authorities had confiscated only 91 verifiable grams of [crack cocaine], and not all of that could clearly be attributed to the alleged conspiracy." Appellants' Br. 20.

The district court's determination of drug quantities for sentencing purposes is reviewed for clear error. See Kellam, 568 F.3d at 147. At sentencing, the government must prove drug quantity by a preponderance of the evidence. See id. A district court "may impose a sentence based on a drug quantity determination greater than that found by the jury so long as the sentence does not exceed the statutory maximum of the convicted offense and the district court's calculation is supported by sufficient evidence." United States v. Young, 609 F.3d 348, 357 (4th Cir. 2010) (internal quotation marks omitted). "A defendant's Base Offense Level under the Guidelines is determined by the amount of drugs reasonably foreseeable to him within the scope of his unlawful agreement." United States v. Lamarr, 75 F.3d 964, 972 (4th Cir. 1996) (internal quotation marks omitted).

The trial evidence and the record provide ample support for the district court's drug quantity finding of 21.46 kilograms. The court first considered the trips made to

19

Atlanta, Texas, and other locations in North Carolina and used the alleged quantities of powder cocaine obtained on those trips and converted them to the crack equivalent, since the evidence at trial suggested the powder was to be used to make crack. The court concluded, "from the Atlanta trips of 11 kilos and then 6 kilos from Winston-Salem, five from Asheboro, that should be a total of 22 kilos. . . . Adding [the 2 kilos sought on the Texas trip], I have a total of 24 kilos of powder cocaine." J.A. 2119. The court then explained, "[t]he evidence was consistent throughout the trial that the only purpose for the powder cocaine was to convert it into crack cocaine for the purposes of resale, so based on the conversion ratio of .894, that would convert . . . [to] 21.46 kilos of crack cocaine." Id.

Alternatively, the court explained,

[I]f you look at the sales of cocaine from the various houses, a conservative estimate, . . . is, 10 grams a day for each house, and the testimony was the houses ran 24 hours a day, seven days a week. That would be 3.65 kilos over a three year period of 2005 to 2007.

Also, the testimony that I find credible was, that [Jacqueline Adams, a worker] also collected packages from Mr. Benn and five gram packs, 1 gram in each broken out pack, four in a bundle, so 5 grams times four is 20 grams. That would be 1.6 kilos.

Further, according to Mr. [Ronald] Duff's testimony, and I find his testimony credible, 15 grams a day from the Brag[g Street] house, would come to 3.6 kilos for the eight to nine month period that he testified to.

20

> That alone, is 8.85 kilos of crack cocaine, which is above the 8.4 kilograms of record level 38 . . . .
>
> In any event, Ms. Grier also testified to additional sales, which in a good week would be 40 grams, which it would be an additional up to 2 kilos. Ms. Mumford also had sales for three and a half years, even if she is selling 1 gram. As the Government indicated, that would be 1.2 kilos. All of that would be well above the 8.4 kilograms, so on either way of looking at the evidence, a minimum of 8.4 kilograms of crack cocaine or cocaine base is attributable, I believe, to Mr. Benn in this case.

J.A. 2120-21.

The district court did not clearly err in determining that these amounts were "reasonably foreseeable to [Appellant Benn] within the scope of" the conspiracy. Lamarr, 75 F.3d at 972. In any event, the district court varied downward from the life sentence and sentenced Appellant Benn to 440 months in prison. For these reasons, Appellant Benn's drug quantity argument fails.

### B.

### Appellant Jeffries

Appellant Jeffries raises challenges both to the quantity of drugs attributed to him for sentencing purposes, and to the sentencing enhancement he received for being a manager/supervisor of the conspiracy.

21

1.

## Drug Quantities

Appellant Jeffries contends that the district court assigned drug quantities to him "that had been attributed to Mr. Benn and his independent operations" and "[t]he totality of the evidence does not show a direct connection between Mr. Jeffries and the drug activities of Mr. Benn at the time Jeffries was seen." Appellants' Br. 41, 42. He also contends the district court erred in assigning the $50,000 that Appellant Jeffries claimed to be his to a drug quantity because "[t]he cash itself was not determined to be related to any particular drug activity." Id. at 41.

The district court assigned to Appellant Jeffries 19 kilograms of powder cocaine, based on three trips to Atlanta (11 kilograms total), three trips to Winston-Salem (6 kilograms total), and a trip to Texas ($50,000 cash converted to 2 kilograms). Based on the conversion rate of .894, this equates to 16.9 kilograms of crack cocaine. Therefore, Appellant Jeffries's base offense level was 38, for an offense involving 8.4 kilograms or more of cocaine base. See U.S.S.G. §§ 2D1.1(a)(5), (c)(1) (2011).

The information upon which the district court based the drug quantity calculation with respect to Appellant Jeffries came from the testimony of co-conspirators at trial. This was

22

proper. See United States v. Slade, 631 F.3d 185, 188 (4th Cir. 2011) ("[I]t is within the discretion of the district court to credit the testimony of [ ] witnesses who discussed [the defendant's] involvement in the drug trade."). In addition, the district court found that Appellant Jeffries not only knew that the trips to Georgia, Winston-Salem, and Texas were to buy powder cocaine to cook into crack, but that Appellant Jeffries also contributed money to at least some of these buys. Further, "[w]here police seize cash . . . from a defendant, the cash can be converted to a quantity of drugs consistent with the normal selling price for the drugs." United States v. McGee, 736 F.3d 263, 271 (4th Cir. 2013).

Having reviewed the record, we conclude the district court's findings were not clearly erroneous. Thus, the drug quantity assigned to Jeffries was proper. See Lamarr, 75 F.3d at 972 (base offense level in a drug conspiracy case is determined by the amount of drugs "reasonably foreseeable . . . within the scope of [the] unlawful agreement").

## 2.

### Sentencing Enhancement

The United States Sentencing Guidelines allow for a three-level upward adjustment to a defendant's offense level if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more

participants or was otherwise extensive." U.S.S.G. § 3B1.1(b)

(2011). As we have explained,

> [t]he adjustment is warranted when a defendant was a manager or supervisor "of one or more other participants." [U.S.S.G. § 3B1.1(b)] cmt. n.2. Therefore, "an adjustment under § 3B1.1 is proper 'only if it was demonstrated that the defendant was an organizer, leader, manager or supervisor of people.'" United States v. Cameron, 573 F.3d 179, 185 (4th Cir. 2009) (quoting United States v. Sayles, 296 F.3d 219, 226 (4th Cir. 2002)) (emphasis in original) (alterations omitted). The burden is on the government to prove by a preponderance of the evidence that the sentencing enhancement should be applied.

United States v. Steffen, 741 F.3d 411, 414 (4th Cir. 2013)

(footnote omitted). Comment 4 to U.S.S.G. § 3B1.1 provides

seven factors to consider in making the determination as to

whether the enhancement applies to a particular defendant: 1)

the exercise of decision making authority, 2) the nature of

participation in the commission of the offense, 3) the

recruitment of accomplices, 4) the claimed right to a larger

share of the fruits of the crime, 5) the degree of participation

in planning or organizing the offense, 6) the nature and scope

of the illegal activity, and 7) the degree of control and

authority exercised over others.

Appellant Jeffries contends that this enhancement was

improperly applied to him because "the record evidence is

insufficient to show that he actually 'managed or supervised'

persons involved in the conspiracy." Appellants' Br. 38. In

24

reviewing this claim, "[i]f the issue turns primarily on a factual determination, [we] should apply the 'clearly erroneous' standard." Steffen, 741 F.3d at 414. But, "if the issue turns primarily on the legal interpretation of a guideline term, the standard moves closer to de novo review." Id. (alterations omitted). However, "[w]e consistently have held that a district court's determination that a defendant held a leadership role in criminal activity is essentially factual and, therefore, is reviewed on appeal for clear error." Id. (internal quotation marks omitted). At sentencing, the Government has the burden of proving that the enhancement applies by a preponderance of the evidence. See id.

In Slade, we reversed the district court's application of the enhancement due to the "absence of any evidence" that the defendant managed or supervised at least one other participant in the offense. 631 F.3d at 191. Although the evidence showed that Slade supplied drugs to other co-conspirators, co-conspirators sold drugs for Slade, and a co-conspirator drove Slade to different places to deliver drugs, there was no evidence that Slade "actively exercised some authority over other participants in the operation or actively managed its activities." Id. at 190.

In contrast, we upheld the enhancement in Steffen, where the defendant "made decisions that reflected his

25

management or supervision of the criminal activities of at least one other person," i.e., using his position as a state highway patrolman "to prevent any other law enforcement agency from stopping" a co-conspirator's vehicle containing drugs, and transferring his electric bill to the same co-conspirator's name in order to avoid being implicated in the conspiracy and to deflect blame to the co-conspirator. 741 F.3d at 416; see also United States v. Llamas, 599 F.3d 381, 389–90 (4th Cir. 2010) (affirming U.S.S.G. § 3B1.1(b) enhancement where the defendant "exercised supervisory responsibility over" the activities of a call center in furtherance of a fraud scheme by, inter alia, enforcing the center's rules, punishing non-compliant operators, and coordinating the operators' activities); Kellam, 568 F.3d at 147–48 (affirming U.S.S.G. § 3B1.1(b) enhancement where the defendant controlled the drug buys of co-conspirators and directed the terms of payment); Bartley, 230 F.3d at 673–74 (affirming U.S.S.G. § 3B1.1(b) enhancement where the defendant directed the activities of street-level drug dealers and advised them on drug sales techniques, set prices and payment terms, and directed the mailing and transport of drugs); United States v. Brooks, 957 F.2d 1138, 1152 (4th Cir. 1992) (affirming USSG § 3B1.1(b) enhancement where the defendant, inter alia, paid employees of the drug operation and "effectively ran the [drug] operation while her husband was ill").

In the instant matter, there were several facts adduced at trial and relied upon by the district court that support the enhancement. The court first found that the conspiracy involved five or more participants, naming Williams, Adams, and Appellants Jeffries, Haith, and Benn. It also concluded the conspiracy was extensive, covering a period of four years, multiple trips across state lines, and distribution at around a dozen crack houses.

As to Appellant Jeffries specifically, Mumford testified that after Williams was in jail, Jeffries "would come around and start doing what [Williams] was doing, [which was] [m]aking sure the rent got paid or bringing us the drugs or receiving the money after we sell the drugs." J.A. 1458. She also testified that Appellant Jeffries would sometimes "run a house" and that she "sold sometimes for" him. Id. In addition, Appellant Jeffries "straightened [] out" a bad deal for Ronald Duff, when he attempted to buy drugs at a house Appellant Jeffries was allegedly running, and Duff never had a problem there again. Id. at 826-27. The district court further found that Appellant Jeffries was present on all of the trips to Atlanta, and that on one trip, he waited at the hotel for Appellant Benn, Appellant Poole, and Shamel after Poole and Shamel jumped from the vehicle to flee law enforcement. It also found, "Jeffries took over [Williams's] role for a period of

time . . . as the second in command to help Mr. Benn run his enterprise. So, in that capacity, he was managing -- helping to manage the delivery of cocaine to the crack houses and the collection of money." J.A. 2285.

This case is more akin to <u>Steffen</u> than it is to <u>Slade</u>; the evidence demonstrates that Appellant Jeffries stepped in as second in command in the Bundy Boys hierarchy, ran a crack house where he had the power to "fix" bad deals, and directed at least one worker in the conspiracy to sell drugs. Based on this evidence, the district court did not err in applying the sentencing enhancement.

C.

Appellants Benn, Jeffries, and Haith

<u>Alleyne v. United States</u>

In supplemental and reply briefs, Appellants Benn, Jeffries, and Haith contend that the drug quantities attributed to them in the PSR and found by the district court were "not submitted to a jury and . . . proven beyond a reasonable doubt," in contravention of <u>Alleyne v. United States</u>, 133 S. Ct. 2151, 2155 (2013). Appellant Haith's Supp. Br. 3; <u>see also</u> Appellants Benn and Jeffries's Rep. Br. 2, 6. Because this issue was not raised below, we review it for plain error. <u>See</u> <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993); <u>Henderson v. United States</u>, 133 S. Ct. 1121, 1126 (2013); <u>see also</u> Fed. R. Crim. P. 52(b)

28

("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Rule 52(b) authorizes an appeals court to correct a forfeited error only if "(1) there is an error, (2) the error is plain, and (3) the error affects substantial rights." Henderson, 133 S. Ct. at 1126 (internal quotation marks and alteration omitted). An error is plain "even if the trial judge's decision was plainly correct at the time when it was made but subsequently becomes incorrect based on a change in law." Id. at 1127 (emphasis in original).

Apprendi v. New Jersey held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Alleyne went a step further, declaring, "[m]andatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." 133 S. Ct. at 2155.

Alleyne has no application to Appellants' sentences in this case. The district court's drug quantity determinations at sentencing did not increase Appellants' statutory mandatory minimum sentences, but rather, were used to determine their advisory Guidelines ranges (from which, in any event, the

29

district court varied downward). Alleyne itself recognized that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." Id. at 2163; see also id. (explaining that its decision is "wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law"); United States v. Ramirez-Negron, --- F.3d ----, 2014 WL 1856762 (1st Cir. May 9, 2014) ("[F]actual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in imposition of a mandatory minimum sentence, do not violate the rule in Alleyne."); United States v. Smith, --- F.3d ----, 2014 WL 1856679 (3d Cir. May 9, 2014) ("Alleyne did not curtail a sentencing court's ability to find facts relevant in selecting a sentence within the prescribed statutory range."); United States v. Cooper, 739 F.3d 873, 884 (6th Cir. 2014) (finding Alleyne had no application to fact-finding resulting in an increased Guidelines sentence, explaining, "Alleyne dealt with judge-found facts that raised the mandatory minimum sentence under a statute, not judge-found facts that trigger an increased guidelines range"); United States v. Claybrooks, 729 F.3d 699, 708 (7th Cir. 2013) (citing Alleyne and explaining, "[a]lthough judicially determined facts are no longer relevant to deciding the applicable mandatory minimum, a district court should

continue to make whatever factual findings are needed to calculate a defendant's advisory Guidelines range"); United States v. Booker, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.").[4]

Thus there is no Alleyne error in the district court's determination of Appellants' drug quantities at sentencing.

D.

Appellant Haith

United States v. Davis

Appellant Haith also challenges his career offender and armed career criminal designations as violative of this court's decision in United States v. Davis, 720 F.3d 215 (4th Cir. 2013).

1.

Davis held, "a consolidated sentence under North Carolina law is a single sentence for purposes of the career offender enhancement." 720 F.3d at 216. Indeed, two of

---

[4] See also United States v. Holder, No. 13-4269, 2014 WL 57798 (4th Cir. Jan. 8, 2014) ("[A]lthough judicially determined facts are no longer relevant after Alleyne to deciding the applicable mandatory minimum, the factual findings needed to calculate a defendant's advisory Guidelines range are still within the district court's province.").

31

Appellant Haith's previous sentences were consolidated for judgment in North Carolina, and the district court counted them separately in determining whether Haith was a career offender.

Because this issue was not raised at sentencing, we review it for plain error. See Henderson, 133 S. Ct. at 1127. Even assuming plain error existed here, the error did not affect Haith's substantial rights. Haith was designated as a career offender under U.S.S.G. 4B1.1, which provides:

> (a) A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a). The PSR, which the district court adopted, listed three previous offenses as satisfying subsection (3) above. They were 97CRS54403 (felony common law robbery); 97CRS46969 (felony indecent liberties with a child); and 97CRS46970 (felony indecent liberties with a child). The latter two were consolidated for judgment. Appellant Haith is correct that, after Davis, the consolidated judgment would count as one sentence for purposes of the career offender enhancement. But even if the two offenses were consolidated, Appellant Haith would still have "at least two" prior felony convictions of

32

crimes of violence, and would have still satisfied the career offender requirements.[5]

## 2.

Appellant Haith also challenges his designation as an armed career criminal, that is, a defendant convicted of an offense under 18 U.S.C. § 922(g) who has "three previous convictions by any court [for a crime punishable by imprisonment for a term exceeding one year] for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e); U.S.S.G. § 4B1.4(a). His argument is based on Davis -- that is, his consolidated judgment should count as only one offense. Davis, however, does not apply to the armed career criminal context.

---

[5] In his supplemental brief, Appellant Haith also argues that the North Carolina felony indecent liberties offenses were not crimes of violence. This is an argument that could have been raised in Appellant Haith's opening brief but was not; therefore, it is waived. See United States v. Hudson, 673 F.3d 263, 268 (4th Cir. 2012); United States v. Leeson, 453 F.3d 631, 638 n.4 (4th Cir. 2006) ("Because Leeson did not present his argument based upon Crawford in the argument section of his opening brief, and Crawford was readily available at the time Leeson filed his opening brief, Leeson's argument based upon Crawford is waived."); see also Fed. R. App. P. 28(a) ("The appellant's brief must contain . . . the argument, which must contain . . . appellant's contentions and the reasons for them[.]"). Furthermore, when Appellant Haith requested supplemental briefing, he did so only to address Alleyne and Davis. See United States v. Benn, No. 12-4522, ECF No. 95 (4th Cir. filed June 26, 2013).

Finally, even assuming error in both the career offender and armed career criminal context, Appellant Haith's offense level would not change because it was already at level 43 before the proposed enhancements about which Appellant Haith complains, and the Guidelines state, "[a]n offense level of more than 43 is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Pt. A n.2 (emphasis supplied). The Guidelines range for an offense level of 43, regardless of the criminal history points, is life in prison. Thus, any potential error here would not affect Appellant Haith's substantial rights. See Henderson, 133 S. Ct. at 1126.

## IV.

Lastly, we consider arguments by Appellants Jeffries and Haith that the expert witness used by the Government, GPD Corporal Jon Marsh, was erroneously admitted and erroneously qualified as an impartial expert witness.

Appellants claim that Corporal Marsh's testimony "was prejudicial to the defendant in that it allowed 'bolstering' of testimony and falsely supported evidence of a single conspiracy." Appellants' Br. 43. They also point out that Corporal Marsh came from "the same investigative body that was involved in the prosecution of [Appellants]" and thus, the court gave "credence that the Greensboro Police Department was

employing highly qualified officers and experts in this investigation, even though Mr. Marsh was not involved in any part of the particular investigation." Id. at 44.

We review a district court's admission of expert witness testimony for abuse of discretion. See United States v. Hopkins, 310 F.3d 145, 151 (4th Cir. 2002). A court abuses its discretion "if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010).

A.

At trial, Corporal Marsh testified with regard to drug distribution and firearms. After opining as to his education and extensive training with regard to narcotics investigations,[6] Corporal Marsh testified about how crack cocaine is normally

---

[6] Corporal Marsh was an eighteen-year veteran with the GPD, having worked thirteen years as a detective in vice and narcotics. He also worked six months on a highway interdiction team and two years in the tactical division working street narcotics. He was a sworn task force officer with the DEA for six years. During his eighteen year career, Corporal Marsh had worked 6,000-8,000 narcotics cases, approximately half of which involved cocaine. He participated in at least 300-400 search warrants (conservatively) and of those, about sixty percent involved cocaine. Corporal Marsh graduated from University of North Carolina at Greensboro with a bachelor's degree in political science. He attended the Greensboro Police Academy where he received 40 hours of training in narcotics and since then continued his training, having received over 680 additional hours of training related to narcotics investigations. He further received training through the DEA when he became a task force officer.

bagged up, how it is cut, the materials used to cut and package it, how much it is usually worth, and how crack houses normally operate. Pertinent to Appellants Jeffries and Haith, Corporal Marsh testified about "why . . . crack dealers have firearms." J.A. 1389. Corporal Marsh explained,

> Most of the time, in my experience, what I have seen is [crack dealers have firearms for] protection for themselves and for the product that they are selling and their money . . . . [They also have firearms] a lot as boasting, trying to basically ward off getting rob[bed]. I've heard -- you know -- if it looks scary or if they feel -- drug dealers think that they can show a gun or intimidate people who are buying from them who may be [an]other [seller]. [T]hey want to ward off the fact of an attempted robbery, boast about it, show them I got a gun. I am not going to be taken like that. I am going to protect myself at any means.

Id. at 1390-91. Corporal Marsh also testified about the types of firearms he typically sees when crack dealers are trying to protect themselves, i.e., handguns, semi-automatic handguns, other concealable weapons, and sometimes shotguns; and the places he typically finds them, i.e., in a closet, on the table, on the mantel, next to a door, underneath a couch.

Appellant Jeffries filed a motion for expert credentials on February 7, 2012, one week before trial. The Government filed its expert witness notification for Corporal Marsh on February 16, 2012, three days after jury selection and two days after trial testimony began. Even then, Appellant Jeffries claims he only received a "curriculum vitae, as well as

36

hand-written notes from Detective Marsh compiling his training over the years." Appellants' Br. 43.

On February 20, 2012, Appellant Haith filed a motion to exclude Corporal Marsh, claiming that the evidence sought to be presented was not reliable (under Rule of Evidence 702), and was more prejudicial than probative (under Rule of Evidence 403). The motion was made only on behalf of Appellant Haith, and did not mention the timeliness of the notice of the expert testimony of Corporal Marsh; however, on the morning of February 23, 2012, Appellant Jeffries's counsel addressed the timeliness of the motion, stating, "I . . . object to the timeliness of the [notice] for the record. The notice was given on [February] 16th after motions had been filed requesting reports from expert witnesses, which were filed timely before the beginning of trial." J.A. 1371.

The district court ruled that the testimony would be allowed "with proper foundation laid for each aspect of testimony." J.A. 17. As to the timeliness argument, the district court explained, "I think folks have had time to certainly be prepared for it. So it is not coming as any shock to anybody. It is also the kind of testimony that, for those of us who deal with it on a daily basis in connection with these types of cases, is certainly anticipated; that is, there is very

little of this that is new or novel to anybody."  Id. at 1375-76.

B.

We are troubled about the way in which the expert testimony of Corporal Marsh was introduced and utilized by the Government.  At oral argument, the Government stated that it certified Corporal Marsh as an expert because it wanted to "err on the side of caution," even though Corporal Marsh's testimony "wasn't the kind of information that we typically consider an expert opinion." Oral Argument at 50:40-51:00, United States v. Benn, No. 12-4255 (April 11, 2014), available at http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.  The Government reiterated that in the Middle District of North Carolina, "we don't typically file the notice of expert opinion [when police officers testify about the connection between guns and drugs.]  We ordinarily bring it in as lay opinion testimony."  Id. at 52:20-28.  Despite this assertion, in this case, the Government not only sought to certify Corporal Marsh as an expert, but did so three days after trial began, and more than a week after Appellants requested expert disclosures.  This is far from "err[ing] on the side of caution."  In fact, doing so gives the impression of bestowing the court's imprimatur on what -- the Government now argues -- is essentially lay witness testimony.

38

Furthermore, this and other courts have appropriately excluded expert witness testimony based on untimely notice. See, e.g., United States v. Harris, 995 F.2d 532, 536 n.4 (4th Cir. 1993) ("[D]efense counsel's advice and presentation to the court on the first day of trial hardly gave the government adequate notice of his intention to use an expert witness."); United States v. Curry, 977 F.2d 1042, 1052 (7th Cir. 1992) (notice of the proposed proffer of expert testimony given four days before trial was prejudicial to the government and would have justified its exclusion); United States v. Dowling, 855 F.2d 114, 118 (3d Cir. 1988) (notice of the proposed proffer of expert testimony given five days before trial was considered prejudicial to the government), aff'd on other grounds, 493 U.S. 342, 354 (1990); see also Wilkins v. Montgomery, --- F.3d ----, 2014 WL 1759083 (4th Cir. May 5, 2014) (in a civil case, finding no abuse of discretion in district court's exclusion of expert testimony where disclosure was made after the agreed-upon expert disclosure date, after discovery was closed, after Appellee filed a motion for summary judgment).

Although we have misgivings about the Government's actions regarding this matter, we find no abuse of discretion on the part of the district court. For one thing, it does not appear that Appellants were prejudiced by the late notice. See United States v. Figueroa-Lopez, 125 F.3d 1241, 1247 (9th Cir.

39

1997) (holding that a defendant "must demonstrate prejudice to substantial rights to justify reversal for violations of discovery rules").[7]  In the week between the Government's disclosure and Corporal Marsh's testimony, Appellants did not ask for a continuance to seek and submit their own expert, and both Appellant Jeffries's and Appellant Haith's attorneys cross-examined Corporal Marsh at trial.  During cross examination, defense counsel firmly developed Appellants' position that Corporal Marsh's testimony "ha[d] no connection . . . whatsoever" to the specifics of the case at hand.  J.A. 1402. Contrast United States v. Garcia, --- F.3d ----, 2014 WL 1924857, at *7-8 (4th Cir. May 15, 2014) (holding that the district court abused its discretion in allowing law enforcement expert testimony where "there were inadequate safeguards to protect the jury from conflating [the expert's] testimony as an expert and fact witness" and the expert "used her personal knowledge of the investigation to form (not simply to 'confirm') her 'expert' interpretations.").

Further, Corporal Marsh's testimony did not, in fact, contravene the rules of evidence.  Fed. R. Evid. 702 provides,

---

[7] See also United States v. Richardson, 128 F. App'x 305, 309 (4th Cir. 2005) (even when a defendant is given late notice of an expert witness, he is not entitled to relief unless he "suffered . . . prejudice as a result of th[e] [discovery] violation").

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, "the trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). Based on Corporal Marsh's qualifications and credentials, it was not an abuse of discretion for the district court to allow his testimony to aid the jury in understanding the complex inner workings of drug conspiracies and the connection between guns and drugs.

Similar testimony has been upheld as appropriate by this court. See, e.g., United States v. Galloway, --- F.3d ----, 2014 WL 1424939, at *6 (4th Cir. Apr. 15, 2014) (under plain error review, the district court did not err in qualifying police officers as expert witnesses with regard to interpreting intercepted drug-related phone conversations); United States v.

41

_Baptiste_, 596 F.3d 214, 223 (4th Cir. 2010) (on plain error review, expert testifying about his approach to decoding language used by drug dealers did not contravene Rule 702); _Hopkins_, 310 F.3d at 151 (expert who explained how the materials found in Hopkins's car led him to believe, based on his experience and training, that Hopkins was involved in drug distribution was properly admitted under Rule 702); _United States v. Gastiaburo_, 16 F.3d 582, 589 (4th Cir. 1994) (holding district court properly admitted expert testimony regarding tools of drug trade); _United States v. Brewer_, 1 F.3d 1430, 1435-36 (4th Cir. 1993) (expert testimony concerning the significance of extensive phone traffic between Brewer and members of the alleged drug ring did not contravene Rule 702).

Likewise, courts -- including our own -- have also held such expert testimony admissible in the context of drugs and firearms. _See, e.g._, _Hopkins_, 310 F.3d at 151 (affirming admission of expert testimony that a "small caliber weapon," inter alia, led an officer to conclude that Hopkins was a drug dealer); _see also_ _United States v. Anchrum_, 590 F.3d 795, 804 (9th Cir. 2009) (allowing law enforcement agent to testify as expert and opine on the "various reasons a hypothetical drug dealer would possess a firearm"); _United States v. Blount_, 502 F.3d 674, 679-80 (7th Cir. 2007) (district court did not err in

allowing police officer to offer expert opinion that gun was used to protect defendant's drug business).

Further, we cannot say that the district court's admission of Corporal Marsh's testimony was "guided by erroneous legal principles" with respect to Federal Rule of Evidence 403. Johnson, 617 F.3d at 292. As explained above, the probative value of the testimony was high, and the prejudice to Appellants was low -- especially considering Corporal Marsh admitted he was not speaking directly about the Bundy Boys conspiracy, and there was ample evidence otherwise supporting the jury verdicts against Appellants Jeffries and Haith. For these reasons, the district court did not abuse its discretion in allowing Corporal Marsh to testify as an expert.[8]

V.

For the foregoing reasons, as to all Appellants, the judgment of the district court is

AFFIRMED.

---

[8] Nonetheless, we caution the Government against the have-their-cake-and-eat-it-too attitude exhibited in this case regarding law enforcement testimony. The Government either views it as expert testimony or not. If the former, they need to behave accordingly and provide timely notice.